IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Lamont Holliman,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v.   ) | 1:21cv1060 (CMH/WEF) |
| ) | |
| **Col. Bowers, et al.,** ) | |
| **Defendants.** ) | |

MEMORANDUM OPINION

This matter is before the Court upon several pending motions in this civil rights action filed under 42 U.S.C. § 1983 by Lamont Holliman ("plaintiff"), who alleges that officials at Western Tidewater Regional Jail ("WTRJ") violated his rights. See [Dkt. No. 1]. Specifically at issue are several competing Motions for Summary Judgment [Dkt. Nos. 24, 30, 55][1] and other ancillary motions, including several requests for discovery [Dkt. Nos. 50, 51, 53] and a Motion to Quash [Dkt. No. 47].[2] For the reasons explained below, the Motion for Summary Judgment filed by defendants Bowers, Smith, and Humpress ("defendants") will be granted, the Motions for Summary Judgment filed by plaintiff will be denied, and this action will be dismissed.

**I. Non-Summary Judgment Motions**

The Court will begin by addressing the submissions ancillary to the competing Motions for Summary Judgment. First at issue are plaintiff's three requests for discovery. [Dkt. Nos. 50,

---

[1] Plaintiff has confusingly filed two Motions for Summary Judgment. See [Dkt. Nos. 30, 55]. As explained in greater depth below, for analytical purposes, the Court will combine plaintiff's submissions and treat them as a single motion, for they raise nearly identical arguments and rely on similar sources of evidence.

[2] Also pending is a Motion for Extension of Time filed by defendants. [Dkt. No. 55]. The Court will grant this motion nunc pro tunc to its time of filing and consider defendants' Opposition to plaintiff's second Motion for Summary Judgment as having been timely filed.

51, 53]. Although it is a court's responsibility to consider motions arising from disputes in the discovery process—a Rule 37 motion to compel, for instance—garden-variety discovery requests should be directed to other parties, not to a court. See, e.g., T&S Brass and Bronze Works, Inc. v. Slanina, No. 6:16-03687-MGL, 2017 WL 927948 (D.S.C. Mar. 9, 2017) ("[T]he Court will not conduct discovery for Plaintiffs."). Because plaintiff's submissions are no more than run-of-the-mill discovery requests and do not request judicial intervention in the discovery process, the motions will be denied as moot.

Next at issue is defendants' Motion to Quash. [Dkt. No. 47]. In this motion, defendants seek to quash a submission plaintiff entitled "Judical [sic] Notice" on the grounds that it adds "claims that are wholly unrelated to the claims in the ongoing action," thereby effectively amending or supplementing plaintiff's Complaint. Id. (citing [Dkt. No. 45]). Because the Court agrees that the issues alleged in Docket Entry 45 are irrelevant [3] to the claims before the Court, and because a court may "quash" or "strike" any "redundant, immaterial, impertinent, or scandalous matter," see Fed. R. Civ. P. 12(f), defendants' Motion to Quash will be granted, and the contents of Docket Entry 45 will not be deemed to amend the operative complaint in this action or be considered in adjudicating the opposing Motions for Summary Judgment. If plaintiff wishes to file a new civil action to raise his novel claims, he may do so by filing a new complaint and submitting $402.00 in case initiation fees or an application to proceed in forma pauperis.

---

[3] As defendants accurately observe, this action relates to plaintiff's exposure to COVID-19 during his incarceration at WTRJ. See [Dkt. No. 9]. The claims described in plaintiff's "Judicial Notice," meanwhile, allege that plaintiff is being wrongly incarcerated due to not being credited the correct amount of time spent in confinement while awaiting trial. See [Dkt. No. 45]. These issues are obviously unrelated and must be prosecuted, if at all, in separate civil actions.

## II. Summary Judgment Motions

### A. *Background and Statement of Undisputed Facts*

Plaintiff filed this civil rights action in September 2021, alleging that officials at WTRJ negligently allowed him to be exposed to COVID-19 and later offered preferential treatment to other inmates at the jail. [Dkt. Nos. 1, 6, 9]. He argues that defendants, who are officials at WTRJ, thus committed the tort of negligence and violated his rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses. Id.

As explained in a footnote above, plaintiff has filed two submissions that the Clerk's Office has docketed as motions for summary judgment. The first was filed in response to the Motion for Summary Judgment filed by defendants on October 28, 2022 and consists of two separate documents: one entitled "Objection to Summary Judgement for the Defendants" and another entitled "Motion for Summary Judgment." See [Dkt. No. 30]. The second submission, which plaintiff filed after requesting and receiving discovery materials from defendants, is entitled "Motion for Summary Judgement / Opposition to Defendants' Motion for Summary Judgement." See [Dkt. No. 55]. Both submissions are handwritten, disorganized, and, at points, difficult to understand. Additionally, plaintiff has failed to isolate the relevant pieces of evidence on which he relies, instead opting to supply the entirety of defendants' responses to his requests for discovery. See [Dkt. No. 55-1]. This has forced the Court in some instances to infer and guess which discovery responses he believes support his position.[4] For all of these reasons, constructing a statement of undisputed facts on which to assess the competing motions presented

---

[4] Although plaintiff takes issue with some of the defendants' objections to his discovery requests, see [Dkt. No. 55] at 10-12, he has not filed any motions to compel, requested additional time to seek more discovery, or otherwise requested judicial intervention in the discovery process. Accordingly, the Court sees no justification for delaying consideration of the pending Motions for Summary Judgment.

3

a significant challenge for the Court. Even so, after scouring the record, the Court concludes the following facts are undisputed and relevant to the issues in this action.

Plaintiff was incarcerated at WTRJ between February 20, 2021 and April 30, 2022, during the COVID-19 pandemic. [Dkt. No. 25-1] at 1, ¶ 5. On March 9, 2020, as COVID began to affect the nation, defendant Smith—the superintendent of WTRJ—issued a directive establishing jail sanitation protocols, isolation areas, practices for incoming and outgoing inmates, and ordering a stoppage of in-person visitation and attorney visits. [Dkt. No. 25-3] at 43-45. In July 2020, Smith issued Policy 2.11, entitled "Infectious Disease Prevention Policy for SARS-CoV-2/COVID-19," the stated goal of which was to "control, prevent, and mitigate the spread" of COVID among WTRJ employees. [Dkt. No. 25-4]. WTRJ also developed a COVID-19 Preparedness and Response Plan designed to implement the health and safety requirements set out in state and federal guidelines and executive orders. [Dkt. No. 25-5]. Finally, in January 2021, WTRJ instituted Policy 18-A.9, entitled "SARS/COVID Rapid Testing." [Dkt. No. 25-6].

In the middle of 2021, WTRJ created an "overflow quarantine area" in its gymnasium, where it housed "inmates with potential exposure to COVID who were departing or entering the jail." [Dkt No. 25-9] at 1, ¶ 3. The gym was furnished with mattresses, a toilet, and a sink. Id. Inmates housed in the gym were periodically removed when it was time for them to shower. Id. Although the record does not establish the exact height of the beds in WTRJ's quarantine area, it makes clear that its mattresses were less than twelve inches off the ground. [Dkt. No. 25-7] at 1-2. Federal detainees being held at WTRJ could not be housed in the gym because, pursuant to the Federal Performance Based Detention Standards—which WTRJ agreed to abide by in housing federal detainees—"Prisoner sleeping surfaces" must be "a minimum [of] 12 inches off the floor." [Dkt. No. 25-12] at 5.

Plaintiff, who had heretofore been housed in general population, had a court date scheduled for August 19, 2021 and was moved out of his regular housing unit to WTRJ's bullpen on that morning to await his transport. Id. at ¶ 4. That day, another inmate in the bullpen tested positive for COVID-19 and had thus, through his presence, exposed plaintiff and the other inmates in the bullpen to the disease. Id. at ¶ 5. All of the exposed inmates, including plaintiff, were then moved to the "overflow quarantine area." Id.

Plaintiff was tested for COVID-19 on August 19 and 22, 2021, and his results were negative. [Dkt. No. 25-9]; [Dkt. No. 25-10]. At 3:36 a.m. on August 27, 2021, plaintiff complained of chest pain and was monitored by WTRJ's medical staff. [Dkt. No. 25-11]. At 5:40 a.m., he complained of feeling lightheaded and remained under evaluation. Id. On August 30, 2021, plaintiff tested positive for COVID-19. [Dkt. No. 25-10]; [Dkt. No. 25-11]. On September 13, 2021, plaintiff was asymptomatic and allowed to leave WTRJ's quarantine area by medical officials. [Dkt. No. 25-11].

### B. *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial ... by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Inv'rs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for

summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## C.  *Analysis*

Plaintiff raises—or at least arguably raises—several claims in this action, including claims that defendants violated his rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses and acted negligently by exposing him to COVID-19.[5] Defendants oppose plaintiff's claims for relief both on their merits and through an argument that plaintiff failed to exhaust these claims before filing this lawsuit.

### 1.  Failure to Exhaust

Defendants argue that plaintiff has failed to exhaust administrative remedies before bringing this lawsuit and that he is therefore not entitled to relief. The Court finds that defendants are not entitled to judgment on this basis. Although exhaustion is undeniably mandatory, a detainee bears the burden only to exhaust all *available* administrative remedies. See 42 U.S.C. § 1997e(a). Here, an exhibit attached to plaintiff's original complaint allows for an inference that plaintiff attempted to avail himself of the grievance process but was thwarted, meaning the grievance process may not have truly been "available" to him. Indeed, plaintiff submitted a carbon copy of a grievance form on which he raised his concerns regarding his

---

[5] The Court observes that plaintiff appears to have been a pretrial detainee at all times relevant to this action, and thus, contrary to defendants' arguments, the Fourteenth Amendment, not the Eighth, governs his claim. See, e.g., Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) (stating that a pretrial detainee's claim based on denial of medical care is rooted in the Fourteenth, not the Eighth, amendment). However, because the "constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment," Barnes v. Wilson, 110 F. Supp. 3d 624, 629 (D. Md. 2015), the analysis defendants offer in the Motion for Summary Judgment remains relevant.

placement in WTRJ's gym. See [Dkt. No. 1-1]. Defendants are correct that the grievance is unsigned by any WTRJ official, see [Dkt. No. 25] at 2, ¶ 5, but it is perfectly plausible that plaintiff filled out a grievance form, was provided a copy, and never received an answer.[6] The Court thus concludes that there is a material dispute of fact as to whether the grievance process was available to plaintiff and will deny defendants' exhaustion argument. Cf. Rountree v. Clarke, No. 7:11cv572, 2013 WL 1146180, at *4 (W.D. Va. Mar. 19, 2013) (finding evidence that a plaintiff's grievances were not accepted by prison staff or were never returned to her created dispute of fact regarding availability of grievance procedure).

        2.      Equal Protection

The Court now turns to the merits of plaintiff's claims. Because plaintiff's equal protection claim requires little discussion, the Court addresses it first. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In the prison context, disparate treatment is not constitutionally offensive if it is "reasonably related to [any] legitimate penological interests." Shaw v. Murphy, 532 U.S. 223, 225 (2001).

Here, there is no dispute that plaintiff received different treatment as compared to federal detainees who were also housed at WTRJ—he was forced to remain in the facility's gymnasium

---

[6] Plaintiff alleges that this is exactly what occurred, see [Dkt. No. 30] at 1, but because plaintiff's allegations arise in unsworn documents, the Court does not include those allegations in the statement of undisputed facts, see, e.g., Huff v. Outlaw, No. 9:09-cv-520, 2010 WL 1433470, at *2 (D.S.C. Apr. 8, 2010) ("[T]he law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment.").

quarantine area, where federal detainees were not required to stay; however, as is clear from the record, plaintiff was not similarly situated to these federal detainees. Rather, he was a *state* pretrial detainee and was thus not protected by the agreement between WTRJ and the United States Marshals Service which required, among other things, for federal detainees at WTRJ to sleep at least twelve inches off the floor. Because plaintiff was not similarly situated to the individuals against whom he compares himself, his equal protection claim fails.

3. Deliberate Indifference

Plaintiff asserts several possible factual bases for relief under the Fourteenth Amendment but does little to clarify whether he seeks relief under each ground separately or whether he is broadly dissatisfied with WTRJ's response to COVID-19. To the extent plaintiff is raising three individual claims, the Court identifies the following three factual scenarios as the foundations of these claims: that defendants violated plaintiff's rights by (1) placing him in quarantine with other inmates who had been exposed to COVID-19 despite the fact that he had not yet tested positive; by (2) failing to ensure conditions within WTRJ's quarantine area were adequate to minimize the spread of disease; and by (3) failing to provide him adequate medical attention when he tested positive for COVID. But whether viewed as individual claims or as a single claim, the record demonstrates that defendants are entitled to judgment in their favor.

Claims such as plaintiff's—that is, claims raised by pretrial detainees grieving the conditions of their confinement—have two components, one objective, one subjective. The objective prong requires the detainee to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from the [detainee's] unwilling exposure to the challenged conditions." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (internal quotation marks

omitted). The subjective prong requires a defendant to have had a sufficiently culpable state of mind. Specifically, there must be evidence of deliberate indifference—that is, evidence that a defendant disregarded a known, excessive risk of harm to the inmate's health or safety. See Wilson v. Seiter, 501 U.S. 294, 302-03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). Thus, to survive summary judgment in this action, plaintiff must show facts sufficient for a reasonable factfinder to conclude that (1) he was exposed to a substantial risk of serious harm and (2) that the defendants knew of and disregarded that risk. Thompson v. Comm. of Virginia, 878 F.3d 89, 107 (4th Cir. 2017).

Here, the Court is satisfied that the presence of COVID-19 in WTRJ satisfies the first element of the test just described. See, e.g., Wilson v. Williams, 961 F.3d 829, 840 (6th Cir. 2020). However, as to the second element, the Court concludes that plaintiff has proffered no admissible evidence—and has instead provided only unsubstantiated allegations—that defendants were indifferent to the risks he and other inmates at WTRJ faced from COVID-19.[7] In fact, ironically, in his first opposition to defendants' Motion for Summary Judgment, plaintiff offered a concise summary of the affirmative actions WTRJ officials took to contain the spread of COVID-19 at the facility after an initial case of COVID had been detected. He wrote that:

> [t]he medical department caught their mistake, removed the infected tested inmate ... from the bullpen, then advised Col. Bowers to cancel court. The medical

---

[7] In his multiple oppositions, plaintiff raises arguments that some of the conditions he faced in WTRJ's gymnasium quarantine area did not adhere to recommendations issued by the Center for Disease Control ("CDC"). See, e.g., [Dkt. No. 30] at 3 (alleging that the sink in the gym provided only cold water" and that more than ten people were confined in too small an area). As observed above, all of plaintiff's allegations are unsworn and thus may not be considered as evidence at the summary judgment stage. But even if this were not so, a simple failure to abide by every CDC recommendation would not itself amount to any violation of plaintiff's rights. See, e.g., Murillo v. United States Dep't of Justice, No. CV 21-00425-TUC-CKJ, 2022 WL 16745333, at *4 (D. Ariz. Nov. 7, 2022) (recognizing CDC's concession that, in the prison context, "[p]revention is not 'one size fits all'" and that "[i]t may not be feasible to use all enhanced strategies because of resources, facility characteristics").

> department then proceeded by testing the other inmates in the bullpen. Due to W.T.R.J. Preparedness Procedure, all inmates and all staff are required to wear mask[s] at all times when leaving outside their assigned housing area.

[Dkt. No. 30] at 4. It is unclear why plaintiff believed this information to be supportive of his argument, for it directly undermines the proposition that WTRJ officials failed to take measures to protect their detainees. The record is also replete other with evidence of the numerous health and safety plans and procedures put into place by WTRJ administrators. Thus, the record establishes that, broadly speaking, WTRJ officials *were not* indifferent to the risk that COVID presented at their jail.

Nor can defendants be said to have violated plaintiff's rights as to the three potential subclaims he identifies. First, the very act of isolating plaintiff from other inmates at the facility is evidence that WTRJ officials were not indifferent to the spread of COVID-19, even if plaintiff incorrectly believes that his exposure to the disease did not present any real threat.[8]

Second, the record also fails to show that the conditions plaintiff endured in WTRJ's quarantine area were unconstitutional. Indeed, the inmates in quarantine were provided mattresses, the area had a functional sink, and inmates were allowed to leave to shower at least periodically. Cf. Pape v. Cook, No. 3:20-cv-1324 (VAB), 2021 WL 2186427, at *10 (D. Conn. May 28, 2021) ("[G]iven the existence of the restriction on out of cell exercise during Mr. Pape's period of confinement because of his exposure to his cellmate, who had exhibited symptoms of having contracted COVID-19, Mr. Pape has not plausibly alleged a constitutional violation."); Herbert v. Smith, No. 20-cv-06348 (PMH), 2021 WL 3292263, at *6 (S.D.N.Y. Aug. 2, 2021)

---

[8] It is difficult to discern from plaintiff's submissions, but it appears that plaintiff may have alleged that the inmate to test positive in WTRJ's bullpen was then also placed into the gymnasium quarantine area with him and other inmates. As far as the Court can discern, plaintiff's inadmissible allegations aside, there is no evidence to support this claim.

10

("[A]lthough Plaintiff does not specify why he was denied recreation periods, the timing of the alleged denials ... indicates that Plaintiff was denied recreation periods not because of Defendants' deliberate indifference; but rather, as a result of health and safety restrictions implemented at [his facility] to prevent the COVID-19 virus's spread among the inmate population—a sufficiently 'unusual circumstance' to justify such a denial."); Carolina v. Feder, No. 3:20-cv-658 (SRU), 2021 WL 268854, at *8 (D. Conn. Jan. 26, 2021) (lack of access to shower, hand soap, cell cleaning materials, and clean clothes and bedding for two-week quarantine period not of constitutional dimension).

Finally, the record shows that plaintiff received adequate medical attention while being held in WTRJ's quarantine area. When he complained of chest pain, his blood pressure was taken and he was continuously monitored. [Dkt. No. 25-11] at 1. When he claimed to feel lightheaded, staff checked his gait and monitored him once more. Id. Although plaintiff claims in an opposition that he should have been taken to the hospital once he tested positive for COVID-19, this is no basis for relief, for WTRJ medical staff were apparently satisfied that plaintiff was stable, and "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. Harrison v. Barkley, 219 F.3d 132, 138-40 (2d Cir. 2000); Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (opining that "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation).

\*\*\*

Many courts have identified that COVID-19 presented jail and prison administrators with an incredible challenge: to keep detainees, who by the very nature of their incarceration were housed in close proximity to one another, safe from a highly contagious virus. That many inmates contracted the virus is, of course, unfortunate, but the simple fact that they did so does

not mean their jailers violated their constitutional rights; rather, that their jailers took reasonable preventative efforts is all the Constitution required. See, e.g., Zellers v. Northam, No. 7:21-cv-393, 2022 WL 3711892, at *9 (E.D. Va. Aug. 29, 2022) ("[T]he fact that defendants' efforts were unsuccessful does not mean that they were unconstitutional."); Swain v. Junior, 961 F.3d 1276, 1287 (11th Cir. 2020) ("Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with subjective recklessness as used in the criminal law.") (internal quotation marks omitted).

The record in this case establishes that officials at WTRJ took reasonable efforts to prevent plaintiff and other inmates from contracting and spreading COVID-19. It also reflects that plaintiff was offered reasonable care before and after he contracted the virus. For these reasons, defendants are entitled to judgment in their favor as to this claim.

4. <u>Negligence / Gross Negligence</u>

Finally, plaintiff claims that allowing an inmate with COVID-19 into WTRJ's bullpen constituted gross negligence. [Dkt. No. 9] at 4. The Court need not address this state tort claim because it has found that plaintiff is not entitled to relief as to any of the federal claims he has asserted. See 28 U.S.C. § 1367(a) (a district court has discretion to decline such supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction"); Arrington v. City of Raleigh, 369 F. App'x 420, 423 (4th Cir. 2010) (describing "a strong preference that state law issues be left to state courts in the absence of diversity or federal question jurisdiction").

## III. Conclusion

For the reasons stated above, through an Order that will accompany this Memorandum Opinion, defendants' Motion for Summary Judgment will be granted, plaintiff's Motion will be denied, and this action will be dismissed with prejudice.

Entered this 14TH day of Sept, 2023.

Alexandria, Virginia

/s/ Claude M. Hilton
United States District Judge

13